UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ALLEN TAYLOR** | **CIVIL ACTION** |
| **VERSUS** | **NO.: 18-08941** |
| **B&J MARTIN, INC., ET AL** | **SECTION: "A" (1)** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PLAINTIFF'S POST-TRIAL MEMORANDUM**

**MAY IT PLEASE THE COURT:**

Allen Taylor submits the following post-trial memorandum as requested by the Court.

1. **Introduction**

Captain Allen Taylor ("Taylor") testified he has a GED and was in special education while in school. Taylor began working for B&J Martin, Inc. ("B&J Martin") in 2009 as part of a work release program and became the captain of the F/V DUSTY DAWN on October 14, 2015 when his accident occurred.

2. **The sole proximate cause of Allen Taylor's accident was Corey Gardiner's BIC lighter.**

The testimony and evidence offered at trial clearly establishes that Corey Gardiner's ("Gardiner") white BIC lighter was solely the cause of Taylor's accident.

   a. <u>The lighter and cigarettes belonged to Gardiner.</u>

All crew members who testified at trial – Tony Collins ("Collins"), Alcina Rodgers ("Rodgers"), and Earl Guidry ("Guidry") – confirmed they saw Gardiner with a white BIC lighter and Marlboro Lights multiple times while he was on the F/V DUSTY DAWN. Collins testified

1

he bummed Marlboro Lights from Gardiner.  Rodgers found Gardiner's cigarettes and lighter multiple times and told Gardiner he needed to move his things.  Gardiner was only aboard the F/V DUSTY DAWN for five days prior to Taylor being injured.  Immediately following Taylor's accident, both Collins and Taylor heard Matt Montgomery ask who the lighter and cigarettes belonged to and both heard Corey Gardiner ("Gardiner"), the company representative for Rooster Oil & Gas ("Rooster"), state they both belonged to him.  Defendants presented no evidence at trial that the white BIC lighter and cigarettes did not belong to Gardiner.

### b. Taylor slipped on the lighter prior to beginning his work shift.

Taylor testified that his shift begins at 6:00 a.m. and ends at 6:00 p.m.  His regular morning routine was to wake up at approximately 5:00 a.m., put on a t-shirt, a pair of shorts and Crocs, and tell the crew good morning.  He would then walk out onto the starboard cabin door platform and would usually relieve himself (he was very embarrassed to talk about this) and look at his anchor line.  He testified he would then return to the living quarters to put on his "dickie" uniform to begin his shift at 6:00 a.m.

Taylor testified he followed this same routine on the morning of his accident.  Waking up at 5:00 a.m., it was still dark when he stepped out onto the starboard platform which contained moisture on it.  He testified that the recollections of other witnesses helped him to remember the sequence of events that morning.  Namely that he opened the cabin door, stepped onto the platform, closed the cabin door, took one step still on the platform, and slipped on something hard that came into contact with the bottom of his toes area.

Taylor landed partially on the platform and the steps.  He yelled out and was found by Collins, who was on the other side of the vessel.  Collins testified that he heard the cabin door open and close, then heard a thud, and finally heard Taylor call out.  Collins approached Taylor and recovered a white BIC lighter and a pack of Marlboro Light cigarettes found near Taylor.[1]  Collins

---

[1] Exhibit 64 depicts Collins' recollection of where he found the cigarettes and lighter after Taylor fell in addition to where Collins usually saw the cigarettes and lighter – on the starboard platform.

testified it was apparent to him Taylor slipped on the lighter as there was no other debris in the area.

Taylor walking out onto the starboard platform to relieve himself and look at the anchor line is analogous to a plumber who wears a company branded uniform while working and parks his branded work truck at his home while not working. If the plumber started his work shift at 6:00 a.m. but went outside at 5:00 a.m. in his sleep wear to pick up his newspaper and looked over at his plumbing truck to see it was still there and nothing had been stolen from it, no one would agree he had begun his work shift at that moment.

      c. <u>Taylor did not know the lighter was on the starboard platform, nor was its presence open and obvious.</u>

Collins and Taylor both stated the deck was washed down every evening at the end of each shift, so the cigarettes and lighter could **not** have been there the evening before Taylor fell. Taylor testified he would stand on the starboard platform area every evening after his shift and after eating dinner for an hour to an hour and a half while talking to his wife. He did this the night before his accident and testified he did not see a lighter or cigarettes on the platform at any time while he was on the platform and, if they were there, he would have seen them. Rodgers testified Gardiner would stay up all night and smoke at either cabin door platform. Guidry also testified he saw the white BIC lighter and Marlboro Lights cigarettes left out on multiple occasions in the five days Gardiner was aboard the F/V DUSTY DAWN. It is easy to presume that Gardiner went out to smoke late the night before and left his cigarettes and lighter on the starboard platform.

Photos of the starboard platform introduced at trial[2] show the deck was painted white. All crew members testified Gardiner used a white BIC lighter and Collins found a white BIC lighter near Taylor after his fall. No one else on the F/V DUSTY DAWN smoked Marlboro Lights. Taylor testified it was dark outside when he fell, and the only lights were two yellow bug lights that did not give off much light. These conditions and facts made it difficult for Taylor to see a

---

[2] Exhibit 18 pp. 85-89.

3

white BIC lighter on a white platform. Even defense expert Bob Borison ("Borison") agreed it would be more difficult to see a white lighter on a white platform.

> d. <u>Taylor would have slipped on the lighter even if he had shrimp boots on.</u>

Taylor testified that he wore his company issued Royal shrimp boots while working and slipped several times while wearing these boots and so did the other crew members. It would not have made a difference if Taylor was wearing his shrimp boots at the time of his slip because the BIC lighter was an unexpected hard foreign object on a metal deck. Even Borison stated no shoe is completely slip-proof.

### 3. <u>Borison's testimony was unpersuasive and provided no insight into the mechanics of Taylor's fall.</u>

Borison was supposed to replicate how Taylor fell and show how different shoes might react when met with a lighter on the platform where Taylor fell. But Borison's "testing" was highly unscientific and completely subjective. Borison conducted his "Borison Stomp" test in full daylight, not at 5:30 a.m when it would have been dark outside. He used a gray BIC lighter as opposed to a white BIC lighter. The platform was completely dry even though others testified there had been dew on the platform so early in the morning. He did not use Royal shrimp boots which were the type issued to the crew by B&J Martin, and he didn't even use actual Croc shoes in his "testing." Instead, he used some sort of "knockoff" whose brand could not be identified. Borison also admitted to holding onto the side railings of the F/V Dusty DAWN as he was conducting his stomp tests so he would not fall. No one walks like Borison's "stomp tests". Further Exhibit 19, video 6 shows the shrimp boot slip while Borison moves the shrimp boot over the lighter.

Borison claims in his report that in order to walk onto the starboard platform and close the door, one would have to step off the starboard cabin door and close the door in order to do so. He further stated Taylor's accident could not have occurred as he stated. But Borison proved himself

4

wrong in his own video.[3]  Borison himself showed he was able to open the door, step onto the platform, and close the door without ever stepping off the platform, and Borison admitted he was wrong.  Taylor testified he was able to maneuver around the door while on the platform.

Finally, Borison did not conduct any coefficient of friction testing.  According to Borison himself in his expert report submitted in *Dean v. Sea Supply, Inc., et al* (E.D. La. 2018), Borison criticized Captain Pierce, Plaintiff's expert, because he did not test the coefficient of friction of the deck, he could not definitely say that it lacked sufficient non-skid properties.  In the instant case, Borison now states he does not know how to use a Tribometer or Pendulum Slip resistant test nor how to conduct such a test. He stated he did not conduct any other slip resistant test on the deck or any of the shoes he used for demonstrations.

**4.  The F/V DUSTY DAWN was unseaworthy.**

Separate and apart from B&J Martin's duty to provide a safe work environment under the Jones Act, the vessel owner has an absolute non-delegable duty to provide its seamen with a seaworthy vessel under general maritime law.  *See Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 498-500 (1971).  "To establish a claim for unseaworthiness, the injured seaman must prove that the owner has failed to provide a vessel, including her equipment and crew, which is reasonably fit and safe for the purposes for which it was intended to be used." *Boudreaux v. United States of America*, 280 F.3d 461, 468 (5th Cir. 2002) (*quoting Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001)).  "The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm but a vessel reasonably suited for her intended service." *Boudoin v. Lykes Bros. S.S. Co.*, 348 U.S. 336, 339 (1955).  "A vessel's condition of unseaworthiness might arise from any number of circumstances.  Her gear might be defective, her appurtenances in disrepair, her crew unfit." *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494,

---

[3] Exhibit 19, Video 2

499-500 (1971) (internal citations omitted); *see also Webb v. Dresser Indus.*, 536 F.2d 603, 606 (5th Cir. 1976), cert. denied, 429 U.S. 1121 (1977).

    a. <u>B&J Martin did not properly vet the "Company Man" who worked aboard the F/V DUSTY DAWN and allowed an unfit crew to operate his boat.</u>

 Jimmie Martin ("Martin") testified that B&J Martin does nothing to make sure a company representative that is placed on one of his boats is familiar with general maritime safety procedures. In this case, Gardiner, as the "eyes and ears" of Rooster and employee of Lege Consulting, LLC ("Lege") was allowed to work on the F/V DUSTY DAWN without any investigation by B&J Martin as to his knowledge of general maritime safety rules and procedures. Gardiner then caused Taylor's injury when he left his white BIC lighter and cigarettes on a walking area of the starboard platform. Ordinary prudence would require that Martin, as part owner/operator of B&J Martin, make such a basic inquiry as to whether a non-employee placed on the F/V DUSTY DAWN by Rooster was familiar with general maritime safety standards before allowing that person to step foot onto one of his boats.

    b. <u>B&J Martin failed to enforce its own safety manual.</u>

 Martin and other upper-level management also created a culture of noncompliance with their safety manual in regard to required footwear. According to the B&J Martin Safety Manual,[4] work boots are supposed to be worn anytime outside the cabin. But the entire crew testified that their working knowledge of this policy was to wear their shrimp boots anytime they were on the back deck working. Crew members testified they worked on other boats owned by B&J Martin and it was customary to wear shoes other than shrimp boots during non-working hours and while not on the back of the deck. The crew members and Taylor testified they had to leave their shrimp boots at the back of the cabin so they would not track debris into the living quarters.

 Rodgers, the cook, testified that Chad Martin, Martin's son, saw him smoking on the starboard platform while wearing Crocs several times and did not once address the issue with him.

---

[4] Exhibit 49, p. 1705

Rodgers also testified that Martin would come aboard the F/V DUSTY DAWN not in the shrimp boots supposedly required to be worn on the deck, but in shoes that had net string in the laces. Taylor also testified that he saw Martin onboard the F/V DUSTY DAWN in "church" shoes that were certainly not shrimp boots or steel toed work boots or any shoe matching the requirements of the B&J Martin safety manual. Taylor also saw Martin perform work tasks in these shoes.

Collins testified that he was the only crew member on the F/V DUSTY DAWN who wore flip flops and that Martin did not once throw away his flip flops as Martin claimed in his own testimony and Collins worked for four years for B&J Martin. Taylor testified he was never written up for a failure to follow the safety manual or any other reprimand during his time with B&J Martin. Taylor further testified that he was given multiple "Stop, Look, Observe, Proceed" sheets[5] by B&J Martin to fill out all at once as opposed to at regular intervals and would receive bonuses for doing so.

Further, Chapter 31.0 of B&J Martin's own safety manual states the following:[6]

iv. In the U.S., PPE must meet or exceed OSHA, ANSI, and NFPA specifications as listed below.

| Protective Device | OSHA | ANSI | NFPA |
|---|---|---|---|
| Safety Footwear | 1910.136 | ANSI Z41-1991 | |

At no time did Defendants present any evidence showing the Royal shrimp boots issued by B&J Martin met or exceeded the ANSI standard listed in their own Safety Manual.

Martin's testimony regarding B&J Martin's adherence to the safety manual was also called into question. According to Martin, if a crew member needed shrimp boots, the crew member would tell the Port Captain or the office and the crew member would receive those boots free of charge. However, the entire crew testified B&J Martin would deduct the costs of their boots from their paycheck. This is in direct violation of the B&J Safety Manual.[7] Nowhere in the B&J Martin

---

[5] Exhibit 56.
[6] Exhibit 49, p. 1689.
[7] Exhibit 49, p. 1688.

7

Safety Manual does it mention wearing white shrimp boots; therefore, the company's footwear policy should be null and void.

Chad Martin never reprimanded Rodgers for wearing Crocs on the starboard platform. Martin did not follow his own safety manual regarding footwear nor did he actually throw out any flip flops he found on the boat. This signaled to their employees that certain exceptions to the rules had been carved out of the safety manual by way of custom. Nowhere in the B&J Martin manual mentions white shrimp boots, therefore their footwear policy should be null and void.

    c. <u>A lighter and cigarettes left on walking paths renders a vessel unseaworthy.</u>

It is clear that loose objects left in the pathway where people often walk constitutes a clear tripping hazard. Gardiner was well aware everyone walked across this platform. In no way could a white BIC lighter on a white platform be easily seen by a prudent seaman after stepping onto the platform in the dark.

**5. <u>Rooster Oil & Gas is vicariously liable for Corey Gardiner's negligence.</u>**

Gardiner was onboard the F/V DUSTY DAWN strictly as the "eyes and ears" for Rooster to verify that B&J Martin performed the site clearing activities in accordance with Rooster's standards. Gardiner was supplied by Lege Consulting who contracted with Rooster to provide this service. Under the Rooster Master Service Agreement with B&J Martin,[8] B&J Martin agreed to indemnify Rooster. *Johnson v. Global SantaFe Offshore Services, Inc.*, 799 F.3d 317 (C.A. 5 2015) articulated a test for establishing an employment relationship in the context of a claim that the defendant is vicariously liable for negligence under the general maritime law. This hinges on "the hiring party's right to control the manner and means by which the product is accomplished. Control is probably the most important factor under maritime law to identify employment relationships." *Johnson*, at 321. The court acknowledged that an employer will be liable through

---

[8] Exhibit 3

*respondeat superior* for negligence of an employee it borrowed, that is, one who does his work under his supervision and control. *Johnson*, at 322.

Rooster had full control over Gardiner while he was on the F/V DUSTY DAWN. Brandon Lege confirmed that Gardiner completed daily "Rooster Petroleum Daily Construction Reports."[9] Gardiner performed Rooster's work and Rooster furnished the place of performance which was the F/V DUSTY DAWN. Taylor testified he had no control over Gardiner's work, nor did he exhibit any control over Gardiner's work. Rooster is vicariously liable for Gardiner's acts of negligence which were committed while Gardiner performed his duties on behalf of Rooster.

**6. <u>Comparative negligence does not apply in this case.</u>**

a. <u>Allen Taylor's shoes were not the cause of his accident.</u>

Even if Taylor had the wrong shoes on to stand on the starboard platform, his actions were not a cause of his fall and resulting injury. The accident at issue here is most analogous to *Dunn v. Marquette Transportation Company, LLC*, Civil Action No. 16-13545 (E.D. La. 2017). In that case, Judge Fallon found that Dunn's negligent actions – wearing tennis shoes in violation of the company's safety rule regarding proper footwear – were not a cause of his fall and resulting injury. Instead, the cause of his fall was the slippery condition of the engine room decks which rendered the vessel unseaworthy. The same is true here. Taylor's shoes did not cause his fall. The presence of the white BIC lighter on the white, metal platform, in the dark, caused his fall. Taylor testified he often stood on that platform in his Crocs to call his wife or check the anchor line and not once did he slip until Gardiner left his lighter on the deck. Judge Fallon's ruling in *Dean v. Sea Supply, Inc., et al* (supra) is distinguishable. In that case, Captain Dean went back and forth through the engine room during his work shift and failed to prepare for the oily conditions he knew were in the engine room by not cleaning his shoes. Judge Fallon found that Dean did not wear proper footwear in the engine room and failed to properly prepare for his task by not cleaning

---

[9] Exhibit 42.

his shoes after exiting the bilge and to clean the walking surfaces before beginning the task. These were the sole causes of Dean's accident and injuries.[10] In the present case, Taylor was not on shift, not in the work area of the boat (the back deck) and had no knowledge that the lighter was on the platform as it was left overnight by Gardiner. Taylor's accident could not happen without the lighter.

       b. <u>Even if Allen Taylor is found to be contributorily negligent, his recovery is not barred.</u>

Should this Court find that Taylor contributed in any way to his accident, he is still entitled to recover a portion of his damages from Defendants. "A seaman's contributory negligence will not bar his recovery, but may reduce the amount of damages owed proportionate to his share of fault." *Jauch v. Nautical Services, Inc.*, 470 F.3d 207, 213 (5th Cir. 2006). "The standard of care for a seaman under the Jones Act is to act as an ordinarily prudent seaman would act in similar circumstances." *Jackson v. OMI Corp.*, 245 F.3d 525, 528 (5th Cir. 2001); *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 338-39.

Based on the testimony describing B&J Martin's self-created culture of not wearing shrimp boots while not at work, it was more than prudent for Taylor to wear his Crocs while not working. Everyone had done so without incident until Gardiner left his lighter on that platform. Again, crew members testified wearing anything other than a shrimp boot while in the wheelhouse or not during working hours was standard operating procedure for B&J Martin.

**7. <u>Allen Taylor's claims against Lege Consulting and Gardiner are not time-barred.</u>**

This Court has now ruled twice that Taylor's claims against Lege Consulting and Gardiner are not time-barred. (Rec. Docs. 44 & 58). Defendants argue Taylor's claims against Lege and Gardiner are time barred because they were not added as defendants until Taylor filed his Amended Complaint naming them as additional parties. (Rec. Doc. 15-1, p.4). The relevant section of Rule

---

[10] *Dean* at 12.

15(c)(1) allowing for an otherwise prescribed pleading to relate back to the date of filing a timely complaint is 15(c)(1)(C)(ii) – the amendment changes the party of the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment: (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

In *Krupski v. Costa Crociere*, the Supreme Court held that the only question under Rule 15(c)(1)(C)(ii) is whether the amended additional defendant knew of should have known that, absent some mistake, the action would have been brought against him.  130 S.Ct. 2485, 2494, 560 U.S. 548 (2010).  As the Court has pointed out, B&J Martin must defend and indemnify Rooster, its agent, Lege Consulting, and employee, Gardiner pursuant to the Master Services Agreement.  In October of 2018, B&J Martin acknowledged this indemnification.[11]  On December 3, 2018, prior to the ninety-day period expiring, B&J Martin answered discovery which identified Gardiner and Lege as potential defendants.  The Court rightly emphasizes that Taylor was not required to establish actual notice, but rather, whether Defendants knew or should have known of the pending suit.  Additionally, it is implied that Lege and Gardiner had knowledge of the suit filed by Plaintiff under the shared counsel doctrine as they have the same attorney as B&J Martin and Rooster.[12]  *Barkins v. International Inns, Inc.*, 825 F.2d 905, 907 (5th Cir. 1987).

As this Court has stated, Firth Circuit long standing precedent establishes great discretion in this Court to grant or deny motions for reconsideration, and the Court appropriately denied Defendants' Motion for Reconsideration on the issue. (Rec. Doc. 58).

   **8.  <u>Allen Taylor's health care questionnaires are not at issue in this trial.</u>**

Taylor sustained a prior back injury from a workplace accident in 1999 and he made a full recovery without limitations.  He was hired by B&J Martin in June of 2009 and again in July of

---

[11] Exhibit 54.
[12] Exhibit 25.

11

2011 and able to perform his job for six years without injury prior to this accident. The Court's ruling of September 27, 2019[13] details the insignificance of the healthcare questionnaires as they were not material to B&J Martin's decision to hire Taylor. Through testimony, Taylor confirmed that he was confused by the word disease on the 2011 questionnaire and that is why he answered no. Martin acknowledged B&J Martin should have reviewed the 2011 questionnaire and require its completion. This is further indication that B&J Martin did not rely on this form in deciding to hire Taylor but instead had the form completed as a pro forma procedure after he was hired. While the Court has ruled on the first two arms of the *McCorpen*[14] test - concealment and causal link - B&J Martin failed to display application of the third arm, materiality during trial testimony. The ruling from the Court's September 27, 2019 Order and Reasons notes that on the 2011 questionnaire form Taylor failed to write either "Yes" or "No" in the boxes related to the first two questions which asked (1) whether Taylor "ever had an injury, disease, or medical problem with [his] … back …" and (2) whether Taylor "ever had or experienced … back pain."[15] This form remained unchanged and no attempt was made by the employer to have this section completed by the employee during the four years after completing this form that Taylor worked for B&J Martin. It was only eight years later that defendant attempted to utilize this information or lack thereof as a technicality to obtain summary judgment. This information was never sought as part of a pre-employment medical exam or interview. Further, Martin acknowledged the lack of its importance in that it was not required to be completed after it was submitted incomplete and thus was not important to the employer's decision to rehire Taylor.

9. **Taylor's three surgeries and pain management are a direct result of this workplace accident, and all of Taylors treating doctors were selected by B&J Martin or their representative who attended all doctors' appointments.**

A week after the fall occurred, Taylor went to Dr. Ralph Katz who recommended an MRI on Taylor's lumbar spine and prescribed pain medication. After reviewing the MRI results, Dr.

---

[13] Rec. Doc. 63, Order and Reasons issued 9/27/2019.
[14] *McCorpen v. Cent. Gulf S.S. Corp., 396 F2d 547 (5th Cir. 1968)*
[15] Record Doc. 63, p. 11.

Katz administered an epidural steroid injection on November 10, 2015.[16]  However, Taylor still complained of back pain, so Dr. Katz performed a microscopic laminectomy discectomy right L5-S1 surgery on September 6, 2016.[17]  Taylor did not receive any relief from the first surgery.  He next saw Dr. Manish Singh who performed a re-exploration of the previous L5-S1 discectomy with right-sided L5 laminotomy and micro discectomy of the recurrent disc herniation September 6. 2016.  Receiving no relief from these two procedures, Taylor submitted to an IME with Dr. David Ferachi on August 15, 2017.  Dr. Ferachi stated he believed the injury was caused by or aggravated by the work-related injury of October 14, 2015.[18]  Dr. Ferachi performed a one level lumbar fusion on November 10, 2017.  Dr. Ferachi recommended Taylor to pain management on April 30, 2018[19] and, finding that he could offer him no further treatment options, placed Taylor at MMI on March 19, 2019 with light to medium work duty.[20]  Dr. Ferachi stated that any failure to report the 1999 injury was irrelevant because that injury did not occur in the last couple of years and he was at full duty, working on the boat without restrictions when the injury occurred.[21]  Dr. Andrew Todd then examined Taylor on April 29, 2019 for a second opinion and noted "unfortunately, I have nothing to offer him from a surgical point of view and this is something he will have to continue to pursue via pain management."[22]  Taylor treated with Dr. Kevin Coyle, board-certified in anesthesiology with a subspecialty board certification in pain medicine in Georgia.  Dr. Coyle treated Taylor with a combination of Lyrica, hydrocodone and Baclofen.[23]  Dr. Coyle stated that Taylor will not be able to resume work as a boat or a truck driver[24] and confirmed limitations of lifting, bending, climbing, twisting, alternating positions, and the ability to lay down for 15-minute intervals when needed, and he could only work no more than four hours

---

[16] Deposition of Dr. Ralph Katz,  p. 9, l. 4-7.
[17]  Id., p. 10, l 2-17.
[18] Deposition of Dr. David Ferachi, p. 9, l. 5-12.
[19] Id., p. 12, l. 25.
[20]  Id., p. 25, l. 9
[21] Id., p. 23, l. 2-8.
[22] Exhibit 35, p. 1271
[23]  Deposition of Dr. Kevin Coyle, p. 11, L 5-13.
[24]  Id., p. 11, l. 5-13.

a day.[25]  Dr. Coyle further opined that Taylor would need to stay on the Baclofen and Lyrica for the rest of his life.[26]

### 10. Dr. Lacy Sapp's testimony evidences that Taylor cannot return to the workplace with these limitations.

Dr. Sapp testified that Dr. Coyle's restrictions of part-time, sedentary to light physical strength work plus 15-minute breaks to lie down deemed him unemployable.  Nancy Favaloro's report was dated December 12, 2019 and Dr. Coyle's deposition was taken on January 26, 2020.  Dr. Coyle's restrictions were never updated in Favaloro's report.  Accordingly, Favaloro's testimony, although she is well qualified in the field, failed to note the limitations of the pain management physician, Dr. Kevin Coyle, and thus should be stricken for job placement positions cited by her as they all required standing without an opportunity to lie down for 15-minute periods.  For these reasons, Dr. Sapp's opinion that Taylor is unemployable is more accurate.

### 11. Dr. Shael Wolfson's testimony should be given great weight.

Dr. Shael Wolfson's trial testimony provided a more accurate calculation of work life years than that of John Theriot.  Dr. Wolfson calculated a work life expectancy of 65 years; Theriot calculated only 10 years of remaining work life, reducing his work life expectancy by one-third.  Dr. Wolfson opined as to the fluctuations of a captain's pay and found it had decreased about 4% over the years.  Dr. Wolfson also calculated lost meals and fringe benefits which included health insurance.  Dr. Wolfson included medicines that Taylor would remain on for the rest of his life per Dr. Coyle, whereas Theriot admitted he did not calculate these.  Theriot admitted there is no one methodology used exclusively for an accurate determination of lost future wages.  Theriot failed to calculate past and future meal costs and fringe benefits.  Theriot also calculated annual pay for positions Taylor does not qualify for given his work restrictions by Dr. Coyle.  Dr. Wolfson's

---

[25] Id., p. 16, l. 17-24.
[26] Id., p. 24, l. 19-25.

calculations are a more accurate calculation of past and future lost wages, past and future meal costs and fringe benefits.

### 12. Unpaid Medical Bills Under Cure

Exhibit 37 shows unpaid medical bills totaling $3,665.00. All bills were incurred prior to May 20, 2019 when this Court ruled that Taylor reached maximum medical improvement. These bills have not been paid as per Cure benefits; therefore, Plaintiff requests attorney's fees and penalties and interest as in *Dunn*.[27]

As a direct and proximate result of Defendants' negligence, and the unseaworthiness of the F/V DUSTY DAWN, Taylor has sustained damages for economic losses, past and future medical expenses and pain and suffering and request the court award him damages as outlined below:

| | |
|---|---|
| Unpaid Medicals | $       3,665.00 |
| Future Medical Expenses | $   120,607.00 |
| Past Lost Wages After Tax | $   380,807.00 |
| Past Lost Meal Costs | $     22,590.00 |
| Lost Future Wages | $1,099,302.00 |
| Lost Future Meal Costs | $     62,431.00 |
| Lost Future Fringe Benefits | $   235,714.00 |
| Past and Future Mental Anguish | $   500,000.00 |
| Future Mental and Physical Pain and Disability | $   750,000.00 |
| Total Damages | $3,175,116.00 |

WHEREFORE, Plaintiff prays the Court award him damages as outlined above. Plaintiff further prays he be awarded pre and post judgment interest, attorney's fees and court costs, and for all further relief to which he may be justly entitled.

Respectfully submitted,

*/s/ Jim S. Hall*
**JIM S. HALL ( #21644)**
**MATTHEW B. MORELAND (# 24567)**
**JENNIFER L. CROSE (# 32116)**
800 N. Causeway Blvd., Suite 100
Metairie, Louisiana 70001
Telephone: 504-832-3000

---

[27] *Dunn* at p. 25 (Fallon, J.).

## CERTIFICATE OF SERVICE

I do hereby certify that I have on the 30th day of April, 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*/s/ Jim S. Hall*
**JIM S. HALL**