UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ALLEN TAYLOR — CIVIL ACTION

VERSUS — NO. 18-8941

B & J MARTIN, INC., ET AL. — SECTION "A" (1)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This is a civil action brought by Plaintiff Allen Taylor pursuant to the Jones Act and general maritime law against B&J Martin, Inc., Rooster Oil & Gas, LLC, Lege Consulting Services, LLC, Corey Gardiner, Starstone Underwriting Limited on behalf of Lloyd's Syndicate 1301, and Houston Casualty Company. Plaintiff seeks damages for injuries allegedly sustained while he was employed as captain onboard the F/V DUSTY DAWN. Plaintiff alleges that on October 14, 2015, he slipped and fell on the deck after stepping on a cigarette lighter that had been left near the stairway. Plaintiff seeks recovery for injuries to his back that he contends are causally related to the incident aboard the F/V DUSTY DAWN. Defendants deny liability claiming that Plaintiff's injuries were caused in whole or in part by Plaintiff's own actions.

The case was tried to the Court, sitting without a jury, on April 19-20, 2021. The Court has carefully considered the testimony and evidence at trial, the depositions submitted in lieu of live testimony, the arguments of counsel, and applicable law. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law. To the extent that any findings of fact

may be construed as conclusions of law, the Court hereby adopts them as such. To the extent that any conclusions of law constitute a finding of fact, the Court adopts them as such.

**I. FINDINGS OF FACT**

Plaintiff Allen Taylor was at all relevant times an individual of the age of majority and a resident of Louisiana. Plaintiff now resides in Georgia. Plaintiff finished high school and was in special education.

Defendant B&J Martin, Inc. ("B&J Martin") is the owner and operator of the F/V DUSTY DAWN ("DUSTY DAWN"), a specialized trawling vessel very similar to a shrimp boat. Plaintiff applied for a position with B&J Martin in June 2009 as part of a work release program. After several years working for B&J Martin and after the work release program ended, in or around July 2011, Plaintiff applied to B&J Martin for a more permanent position. B&J Martin first hired Plaintiff as a deckhand and later promoted him to serve as the captain of the DUSTY DAWN. He had served as captain of the DUSTY DAWN for a number of years prior to the accident. Plaintiff had prior maritime experience and had worked as a captain for another maritime employer. Additionally, Plaintiff had earned his Master of Towing Vessels (unlimited) license in July 2004 from the United States Coast Guard.

Defendant Rooster Oil & Gas, LLC ("Rooster Oil & Gas") is a foreign limited liability company that was authorized to do business in Louisiana. Rooster Oil & Gas is no longer active and filed for Chapter 11 bankruptcy in the U.S. District Court for the Western District of Louisiana. The bankruptcy proceeding is still open; however, the bankruptcy stay has

been lifted for this case.

Rooster Oil & Gas and Rooster Oil & Petroleum, LLC ("Rooster Petroleum") are sister companies (collectively "Rooster"). In or around October 2015, Rooster Petroleum contracted with B&J Martin to perform site clearance trawling for Rooster at its East Cameron Block 129 field in the Gulf of Mexico ("the Work"). Rooster Oil & Gas owned this field, but Rooster Petroleum operated it. Site clearance generally involves cleaning debris off the bottom of the Gulf of Mexico by dragging a gorilla cargo net on the bottom.

Lege Consulting Services, LLC ("Lege Consulting") is a limited liability company duly organized under the laws of the State of Louisiana with its principal place of business in Vermilion Parish, Louisiana. Lege Consulting was hired by Rooster to put a "company representative" on the DUSTY DAWN to observe the work.

Corey Gardiner ("Gardiner") was, upon information and belief, a resident of Louisiana in or around 2015, and was used by Lege Consulting as the "company representative." Counsel has been unable to locate or contact Gardiner since the filing of this suit.

Starstone Underwriting Limited on behalf of Lloyd's Syndicate 1301 ("Starstone") is a foreign insurer authorized to do and doing business in Louisiana. Starstone provided Protection and Indemnity Insurance to B&J Martin on a primary basis. Starstone issued a primary policy with depleting policy limits of $1,000,000 to B&J Martin.

Houston Casualty Company ("HCC") issued an excess policy of insurance to B&J Martin, excess of the primary policy of insurance issued to B&J Martin by Starstone, with depleting policy limits of $4,000,000.

At all relevant times, Plaintiff was employed by B&J Martin and served as captain aboard the DUSTY DAWN. As a captain, Plaintiff was responsible for the operation of the vessel as well as managing the crew and the vessel's safety, including implementing and enforcing the safety rules.

B&J Martin utilized the DUSTY DAWN to perform the Work pursuant to the contract with Rooster Petroleum.

To verify the completion of the trawling project in accordance with governmental regulations, Rooster subcontracted with Lege Consulting to station a company representative aboard the vessel. This company representative acted as a witness to B&J Martin's trawling project and confirmed the site clearance.

Gardiner, an employee and/or agent of Lege Consulting, served as the "company representative" aboard the DUSTY DAWN at all times relevant to this case.

Plaintiff was injured at approximately 5:35 a.m. on October 14, 2015. On that day, the crew onboard the DUSTY DAWN consisted of Plaintiff Allen Taylor, Matt Montgomery (navigator), Earl Guidry (deckhand), Tony Collins (deckhand), Alcina Rodgers (cook), and Gardiner.

At trial, Plaintiff testified that on the morning of the accident, he woke up at approximately 5:00 a.m., got dressed, and put on a pair of Crocs shoes to go check the anchor line located on the bow of the DUSTY DAWN.[1] He testified that he stepped out of the starboard wheelhouse door onto the platform, closed the door, and took a step toward the stern of the vessel. Plaintiff testified he stepped toward the stern side of the platform

[1] Plaintiff had previously testified in his deposition that he stepped out onto the deck of the DUSTY DAWN that morning to relieve himself over the side of the vessel.

with his right foot, and as his right foot came down, he stepped on top of a white Bic lighter with the ball of his foot, causing him to fall backwards down the stern-side stair. Plaintiff testified that he fell backwards down one step and caught himself on the stern side edge of the platform with his elbows before his buttocks hit the step. Defendants dispute Plaintiff's explanation of how the accident happened and whether the accident did in fact happen. Plaintiff's testimony at trial of how the accident happened differs from his previous deposition testimony. The Court finds that Plaintiff was not truthful in describing how this accident occurred. While the Court is persuaded that Plaintiff injured himself while slipping and falling on the steps, the Court is not persuaded by Plaintiff's testimony of how the accident happened.

Tony Collins testified that, while on the port bow of the vessel, he heard Plaintiff yell and walked around to the starboard side to see Plaintiff lying partly on the main deck and partly on the steps. Collins and Matt Montgomery helped Plaintiff onto his feet and assisted him into the cabin. Collins also recovered the white Bic lighter and a pack of cigarettes from the vicinity of where Plaintiff fell.

Alcina Rodgers testified that he heard and saw Gardiner admit that the cigarettes and lighter belonged to him.

The B&J Martin Safety Manual requires that "[s]afety toed shoes or boots with slip-resistant soles shall be worn at all times while outside the living quarters." (Exh. 49, Bates 1705). As mentioned, at the time of the accident, Plaintiff was wearing a pair of Crocs shoes. There is no evidence to indicate that Plaintiff's Crocs shoes had slip resistant soles.

Bob Borison, expert in marine safety, testified on behalf of B&J Martin. He testified that Plaintiff violated B&J Martin's safety manual by wearing Crocs shoes outside of the living quarters. According to Borison, the B&J Martin Safety Manual requires crewmembers to wear appropriate footwear based on the job they are performing. (Exh. 49, Bates 1678). In particular, on the DUSTY DAWN, a shrimp boat, the crew was expected to wear shoes with "slip resistant soles," such as white shrimp boots, while outside of the living quarters. Additionally, Borison demonstrated that shoes with slip resistant soles, such as white shrimp boots, would have significantly decreased the likelihood of Plaintiff slipping on the lighter. The Court finds Borison's uncontroverted testimony credible. Plaintiff violated company policy by not wearing shoes with slip resistant soles while outside of the living quarters. Had Plaintiff been wearing the proper footwear, according to the expert, Plaintiff would not have slipped on the lighter. This Court agrees.

Plaintiff was the captain of the vessel and should have been aware of B&J Martin's safety regulations which required employees to wear shoes with slip resistant soles while outside the living quarters. Additionally, as captain, Plaintiff was responsible for enforcing the safety regulations. Plaintiff was in violation of the company safety policy and therefore negligent in not wearing the required shoes.

At trial, Plaintiff testified that B&J Martin did not enforce its safety manual in regard to the required footwear and that it was customary to wear shoes other than shrimp boots during non-working hours and while not on the back deck. Jimmie Martin, the chief operator of B&J Martin, testified that B&J Martin was unaware of any crewmembers

violating its footwear policy aboard the DUSTY DAWN. The Court finds Martin's testimony to be more credible.

At all material times, the DUSTY DAWN had a non-skid coating on its deck to prevent crewmembers from slipping. At trial, Borison, who inspected the DUSTY DAWN and its deck, testified that the deck of the DUSTY DAWN had a superior non-skid coating that was "above and beyond" what he had seen on other vessels. Based upon this testimony and the photographs of the DUSTY DAWN, the Court finds that the deck of the DUSTY DAWN was reasonably safe and had no defects or safety hazards. Accordingly, the Court finds that B&J Martin satisfied its duty to provide Plaintiff a safe place to work. Thus, B&J Martin was not negligent.

Plaintiff has undergone significant medical treatment which he attributes to the October 14, 2015 accident. This treatment included three surgeries and multiple epidural steroid injections. On December 10, 2015, Plaintiff had an epidural steroid injection at his right L5-S1. On December 18, 2015, Plaintiff had a microdiscectomy at right L5-S1. On September 5, 2016, Plaintiff had a re-exploration of the previous L5-S1 discectomy with right side L5 laminectomy and microdiscectomy of the disk herniation, right L4-S1 partial medial facetectomy, and right L5-S1 foraminotomy. On November 10, 2017, Plaintiff had a cage fusion with laminectomy revision. At the time of the accident, Plaintiff was 45 years old.

Plaintiff's negligence in failing to wear the proper footwear in accordance with B&J Martin's safety manual was the cause of the October 14, 2015 accident. The Court finds Plaintiff 100% at fault for this unfortunate accident and any injuries he attributes to the

accident.

## II. CONCLUSIONS OF LAW

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333, which provides original jurisdiction over admiralty or maritime claims, and the Jones Act, 46 U.S.C. § 30104.

In this lawsuit, Plaintiff has asserted claims under the Jones Act and general maritime law, specifically a claim for unseaworthiness and maintenance and cure. The testimony presented clearly establishes that Plaintiff Allen Taylor was a Jones Act seaman at the time of the October 14, 2015 accident. Defendants did not contest Plaintiff's status as a seaman at trial. The substantive law applied to this case is the Jones Act and general maritime law.

The Jones Act creates a statutory cause of action for negligence. *Patterson v. Omega Protein, Inc*., 26 F. Supp. 3d 544, 548 (E.D. La. 2014) (citing *Atl. Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 415 (2009)). Under the Jones Act, employers have a duty to provide a reasonably safe place to work. *Daigle v. L&L Marine Trans. Co*., 322 F. Supp. 2d 717, 725 (E.D. La. 2004). An employer breaches its duty if it disregards a danger that it "knew or should have known." *Colburn v. Bunge Towing, Inc*., 883 F.2d 372, 374 (5th Cir. 1989). Although this duty is "broad," it is not tantamount to strict liability. *Id*. Rather, the employer "must have notice and the opportunity to correct an unsafe condition before liability attaches." *Id*.

A Jones Act employer is liable if the seaman establishes by a preponderance of the evidence that the negligence of the employer or one for whom the employer is

responsible played a part in actually bringing about or causing the injury that he sustained. *Litherland v. Petrolane Offshore Constr. Services, Inc.*, 546 F.2d 129, 132 (5th Cir. 1977).

In order to prevail on a Jones Act negligence claim, "the plaintiff must present some evidence from which the fact finder can infer that an unsafe condition existed and that the vessel owner either knew, or in the exercise of due care should have known, of the condition." *Martinez v. Offshore Specialty Fabricators, Inc*., 481 F. App'x 942, 945 (5th Cir. 2012) (citing *Perry v. Morgan Guar. Trust Co. of N.Y*., 528 F.2d 1378, 1379 (5th Cir. 1976)). The mere fact that an accident occurs or that an injury is sustained does not prove negligence under the Jones Act. *Hernandez v. Trawler Miss Vertie Mae*, 187 F.3d 432, 438 (4th Cir. 1999) (citing *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 543, 114 S. Ct. 2396 (1994)).

Defendants had a non-delegable duty to provide Plaintiff with a safe place to work. However, the Court has already concluded that Plaintiff has not established that any act or omission on behalf of his employer contributed to his accident. Plaintiff's negligence in not wearing the proper footwear was the sole cause of his accident.

"To establish a claim for unseaworthiness, the injured seaman must prove that the owner has failed to provide a vessel, including her equipment and crew, which is reasonably fit and safe for the purposes for which it was intended to be used." *Boudreaux v. United States of America*, 280 F.3d 461, 468 (5th Cir. 2002) (quoting *Jackson v. OMI Corp*., 245 F.3d 525, 527 (5th Cir. 2001)). "The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm but a vessel reasonably suited for her intended service." *Boudoin v. Lykes Bros. S.S. Co.*, 348 U.S. 336, 339

(1955). "A vessel's condition of unseaworthiness might arise from any number of circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The method of loading her cargo, or the manner of its stowage, might be improper." *Usner v. Luckenbach Overseas Corp*., 400 U.S. 494, 499-500 (1971) (internal citations omitted); *see also Webb v. Dresser Indus*., 536 F.2d 603, 606 (5th Cir. 1976), cert. denied, 429 U.S. 1121 (1977). A vessel is unseaworthy when an unsafe method of work is used to perform vessel services. *Rogers v. Eagle Offshore Drilling Serv*., 764 F.2d 300, 303 (5th Cir. 1985); *Burns v. Anchor-Wate Co*., 469 F.2d 730 (5th Cir. 1972). The duty of the vessel owner to provide a seaworthy vessel is an absolute non-delegable duty.

Defendants had a non-delegable duty to provide Plaintiff with a safe place to work and provide seaworthy equipment on the vessel. The Court finds that the deck of the DUSTY DAWN had no defects or safety hazards. Thus, the DUSTY DAWN was seaworthy.

Having considered the testimony of the fact witnesses presented by both sides and the testimony of the expert witness presented by Defendants, the Court has determined that Plaintiff violated the company's safety rule regarding proper footwear outside of the living quarters. Plaintiff's fall and resulting injuries were caused solely by the Plaintiff's failure to use proper slip resistant shoes while outside of the living quarters.

A seaman injured in the course of his or her employment has a claim for maintenance and cure. Maintenance and cure is the implied right of the seaman arising from his or her employment relationship with the shipowner and is "independent of any

other source of recovery for the seaman (e.g., recovery for Jones Act claims)." *Bertram v. Freeport McMoran, Inc*., 35 F.3d 1008, 1013 (5th Cir. 1994). Thus, whether the seaman or employer was negligent is not at issue. *Brister v. AWI, Inc*., 946 F.2d 350, 360 (5th Cir. 1991); *Jauch v. Nautical Services, Inc*., 470 F.3d 207, 212 (5th Cir. 2006). Maintenance is the seaman's right to food and lodging and cure is the seaman's right to necessary and appropriate medical services, and both rights extend to the point at which the seaman reaches MMI. *See Breese v. AWI, Inc.*, 823 F.2d 100, 104 (5th Cir. 1987) (citing *Vaughan v. Atkinson*, 369 U.S. 527, 531 (1962)). Therefore, the maintenance and cure duty does not extend to treatment which is only palliative in nature and "results in no betterment in the claimant's condition." *Rashidi v. Am. President Lines*, 96 F.3d 124, 128 (5th Cir. 1996).

The parties do not dispute that B&J Martin paid maintenance and cure, as well as advances, to Plaintiff from October 14, 2015 until May 2019. These amounts totaled $52,560 in maintenance, $148,334.22 in cure, and $147,073.52 in advances – a total of $347,967.74.

On September 27, 2019, this Court held that Plaintiff reached maximum medical recovery as of May 20, 2019. (Rec. Doc. 63). As such, the Court finds that B&J Martin has satisfied its obligation to pay maintenance and cure pursuant to general maritime law, and B&J Martin owes no further maintenance and cure obligations.

Maintenance and cure will not be owed if it is determined that the seaman "knowingly or fraudulently concealed his condition from the vessel owner at the time he was employed." *Jauch*, 470 F.3d at 212 (citing *McCorpen v. Cent. Gulf S.S. Corp*., 396 F.2d 547, 548 (5th Cir. 1968)). It is well-settled that, "where the shipowner requires the

seaman to submit to a pre-hiring medical examination or interview and the seaman intentionally misrepresents or conceals material medical facts, disclosure of which is plainly desired, then he is not entitled to an award of maintenance and cure." *McCorpen*, 396 F.2d at 549. In order to succeed on a *McCorpen* defense, the vessel owner must show: "(1) the claimant intentionally misrepresented or concealed medical facts; (2) the non-disclosed facts were material to the employer's decision to hire the claimant; and (3) a connection exists between the withheld information and the injury complained of in the lawsuit." *Brown v. Parker Drilling Offshore Corp*., 410 F.3d 166, 171 (5th Cir. 2005) (citing *McCorpen*, 396 F.2d at 548-49).

"In cases involving pre-existing conditions, courts distinguish between nondisclosure and concealment." *Jauch*, 470 F.3d at 212. The standard a court must apply to determine if a seaman intentionally concealed a pre-existing condition turns on whether the employer required the seaman to undergo a pre-employment medical examination or interview. *Id*. If the employer does not require a pre-employment medical examination or interview, a seaman must disclose his pre-existing condition "when in [the seaman's] own opinion the shipowner would consider it a matter of importance." *Id*. (internal quotations omitted). On the other hand, if the employer requires a medical examination or interview, "as part of its hiring process, a seaman who misrepresents or conceals any material medical facts, disclosure of which is plainly desired, risks forfeiture of his maintenance and cure benefits." *Id.* (citing *McCorpen*, 396 F.2d at 549). "Failure to disclose medical information in an interview or questionnaire that is obviously designed to elicit such information . . . satisfies the 'intentional concealment' requirement." *Brown*,

410 F.3d at 174 (quoting *Vitcovich v. Ocean Rover O.N., C.A*. No. 94-35047, 1997 U.S. App. LEXIS 724, at *3 (9th Cir. Jan. 14, 1997)).

This Court previously found on September 27, 2019 that Plaintiff intentionally misrepresented or concealed medical facts from B&J Martin. (Rec. Doc. 63). Plaintiff failed to disclose that he had previously injured his back on two prior occasions. Specifically, Plaintiff originally herniated his L5-S1 disc in a maritime accident occurring in 1999 and he again hurt his back in a car crash in 2004. Despite these two significant prior back injuries, on two separate medical history questionnaires, Plaintiff checked "No" to the question that asked whether he had ever sustained any type of disability, injury or disease. (Exh. 7 & 8, Bates 37-43). Accordingly, the Court again finds that B&J Martin has satisfied the concealment element and the causal link element of the *McCorpen* defense.

However, the Court finds that B&J Martin has not established that Plaintiff's non-disclosed medical history was material to B&J Martin's decision to hire Plaintiff. Plaintiff signed and dated the 2011 B&J Martin health questionnaire. However, and importantly, he failed to write either "Yes" or "No" in the boxes related to the first two questions which asked (1) whether Plaintiff "ever had an injury, disease, or medical problem with [his] . . . back . . ." and (2) whether Plaintiff "ever had or experienced . . . back pain[.]" (Exh. 8, Bates 41). The Court finds that Plaintiff's prior health condition was not material to B&J Martin's decision to hire Plaintiff. B&J Martin made no attempt to have this section completed by Plaintiff during the four years after completing this form that Plaintiff worked for B&J Martin. At trial, Jimmie Martin acknowledged that B&J Martin should have

reviewed the questionnaire and require its completion. In fact, other than his signature and the date, the first page of the questionnaire was left blank.[2] This further indicates that B&J Martin did not rely on the questionnaire in its decision to hire Plaintiff. Thus, the Court finds that B&J Martin cannot establish a successful *McCorpen* defense and is not entitled to reimbursement of any of the monies previously paid to Plaintiff.

Notwithstanding Plaintiff's counsel's outstanding presentation of the case, and after assessing the credibility of the witnesses, the facts clearly demonstrate that Plaintiff is 100% at fault. Accordingly, judgment shall be entered in favor of Defendants, dismissing Plaintiff's claims for damages based on the negligence under the Jones Act, unseaworthiness, and additional maintenance and cure with prejudice.

May 24, 2021

JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE

[2] The first page of the questionnaire includes two boxes for the questions which asked (1) whether Plaintiff "ever had an injury, disease, or medical problem with [his] . . . back . . ." and (2) whether Plaintiff "ever had or experienced . . . back pain[.]" (Exh. 8, Bates 41). The instructions read "write yes or no in the box." *Id.* Plaintiff left both boxes blank.